UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

YVETTE GARCIA,                          §
                                        §
          Plaintiff,                    §
VS.                                     §          CIVIL ACTION NO. 5:13-CV-85
                                        §
PENSKE LOGISTICS, LLC, *et al*,         §
                                        §
          Defendants.                   §

## MEMORANDUM AND ORDER

On May 29, 2013, Plaintiff Yvette Garcia filed the instant action against her former employer Defendant Penske Logistics, LLC ("Penske"), alleging that Penske terminated her because of her sex (female) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); age (43) in violation of the Age Discrimination in Employment Act ("ADEA"); disability (chronic obstructive pulmonary disease) in violation of the Americans with Disability Act ("ADA"); and for exercising her leave rights under the Family and Medical Leave Act ("FMLA").[1]  Dkt. Nos. 1 (Original Complaint), 5 (Amended Complaint).

Now pending before the Court is Penske's Motion for Summary Judgment and Memorandum of Law (Dkt. No. 43), Plaintiff's Response (Dkt. No. 46), and Penske's Reply (Dkt. No. 47).  Having carefully considered all of the filings, the evidence in the record, and applicable law, the Court hereby **GRANTS** Defendant's Motion (Dkt. No. 43) for the reasons explained below.

---

[1] Although Plaintiff also named Delphi as a defendant in this action, the Court dismissed the claims against Delphi in its Order on December 1, 2014.  *See* Dkt. No. 48.

## I. Facts[2]

Plaintiff started working for Ryder at its Laredo distribution center in 1989 and remained there after Penske acquired Ryder's Laredo operations in 2002. Dkt. No. 46, Ex. 1, Deposition of Yvette Garcia ("Pl. Dep.") 52:15–19; 54:2– 27; Dkt. No. 43, Ex. F, Declaration of Hector Javier Garcia ("Garcia Decl.") ¶ 3. Penske provides its customers with distribution, logistics, and supply chain assistance. Garcia Decl. ¶ 4. Penske has three locations in Laredo, including one on Mines Road. *Id.* ¶ 6. Plaintiff worked at the Mines Road facility throughout her employment with Penske, and her manager was Hector Javier Garcia. *Id.* ¶ 8. Penske serviced one external customer out of its Mines Road location: Delphi. *Id.* ¶ 7. Penske and Delphi had a contract whereby Penske was responsible for providing logistics support and various services to Delphi. Pl. Dep. 56:1–4.

### A. Plaintiff's Positions with Penske

Plaintiff's first position with Penske was as a Customer Service Representative; she was subsequently promoted to Senior Customer Service Representative in 2006, then to Customer Service Supervisor in 2007, and then to Customer Service Logistics Manager in 2008, where she worked primarily with Delphi. Garcia Decl., Ex. 4 at PEN00264; Pl. Dep. 70:2–7; 71:3–5; 71:21–24.

In 2009, Delphi requested that Penske create a new Sales Account Manager position for Plaintiff, to which Penske agreed. Pl. Dep., Ex. 13; Pl. Dep. 72:25– 73:11. This brand-new position was created solely to service Delphi and Delphi's

---

[2] The Court presents the facts in the light most favorable to Plaintiff, the non-movant. *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308 (5th Cir. 2004).

customers.  Garcia Decl. ¶ 10.  As part of the new position, Plaintiff reported to Delphi's Sales Manager Ajay Bhargava, though she continued to be paid by Penske. Pl. Dep. 57:19–23, 72:25–73:21; Garcia Decl. ¶ 10.  Although Mr. Garcia completed performance evaluations for Plaintiff in 2006, 2007, and 2009, he did not complete any formal evaluations for her after 2009 because she was working under Delphi managers.  Garcia Decl. ¶ 13.

### B.  Plaintiff's Medical Illnesses and Absences

Since at least 2004, Plaintiff suffered from various breathing and asthma problems that led to a diagnosis of chronic obstructive pulmonary disease, "COPD." Pl. Dep. 59:16–60:10.[3]  She also had several surgeries that included a laparascopy, the removal of a cyst, and a tonsillectomy, after which she reportedly suffered from a bleeding disorder, though no diagnosis was ever made.  Pl. Dep. 62:3–25.  As a result of these and other illnesses, Plaintiff requested FMLA leave twenty-five times from 2006 to 2011.  Dkt. No. 43 at 17–18; Pl. Dep. Exhs. 6–11, 15–33, 50–51, 53.  Penske granted each request.  Pl. Dep. 89:11–12.  Plaintiff was never disciplined for taking any sick leave, leave of absence, or vacation, and she was not placed in a different job position upon returning from leave.  *Id.* 89:14–17; 64:12–19.

Plaintiff copied Mr. Garcia on each request for time off.  Pl. Dep. 89:8–10. Plaintiff's co-workers complained to Mr. Garcia that Plaintiff called in sick at the last minute and that she was inaccessible during absences.  Garcia Decl. ¶ 9. Plaintiff received a complaint about her absences from a co-worker.  Pl. Dep. 69:14–

---

[3] Plaintiff could not recall the date she received the COPD diagnosis or when she first experienced symptoms of COPD, other than that the symptoms began sometime after she started working for Ryder in 1989.  *Id.* 60:9–21.

16.  Plaintiff informed Mr. Garcia about the complaint that she received.  Pl. Dep. 69:12–23.  When Mr. Garcia received such complaints, he told the complaining individuals that Plaintiff was entitled by law to take leaves of absences under the FMLA.  Garcia Decl. ¶ 9.

Mr. Garcia told Plaintiff that her co-workers were complaining about her working from home, Pl. Dep. 86:3–12, and Mr. Garcia told her more than once that she was always sick, *id.* 36:2–5.  Mr. Garcia also told others at Delphi that Plaintiff was "sickly."  *Id.* 40:23–41:2; 42:17–24.  When Plaintiff was first offered the sales account position, Mr. Garcia spoke with a Delphi executive, Mark Heacox, concerning Plaintiff and noted that she was often absent and sick.  *Id.* 40:23–41:2; Dkt. No. 43, Ex. B, Deposition of Mark Heacox ("Heacox Dep.") 80:18–23.

### C.  Plaintiff's Requests to Work from Home

In 2009 and 2010, Plaintiff made a number of requests to work from home for the day.  Pl. Dep. 79:13–23; Pl. Dep. Exhs. 15–27.  The requests cited different reasons, including:  Plaintiff's health, Pl. Dep. Ex. 15–17; her daughter's health, *id.* Ex. 19; "rainy weather," *id.* Exhs. 23–25; and in some instances, no reason for working from home was provided, *id.* Exhs. 21, 26.  Plaintiff submitted the requests to her supervisor at Delphi and to Mr. Garcia, and the requests were repeatedly granted.  Pl. Dep. 88:20–22; Pl. Dep. Exhs. 15–27.  On April 13, 2010, Plaintiff's Delphi supervisor at the time, John Kalusniak, told Plaintiff that she could work from home as she saw fit.  Pl. Dep. Ex. 28.

4

### D. Delphi Employee Complaints Against Plaintiff

In the spring of 2010, Plaintiff began a romantic relationship with Mark Heacox, Delphi's Director of Manufacturing for the Americas.  Pl. Dep. 41:23–42:2; Heacox Dep. 23:19–21.  On March 2, 2011, Delphi Investigations Manager Jarriel Koplin received a complaint from a Delphi employee alleging that Mr. Heacox was covering Plaintiff's expenses for lodging, vehicles, and meals with his company credit card, even though such expenses were not business related.  Dkt. No. 43, Ex. G, Declaration of Jarriel A. Koplin ("Koplin Decl.") at 5.  The complaint also alleged that Plaintiff had yelled at the complainant during a telephone call, saying, "you better do it or you will lose your job, I will let Mark Heacox know, so he will take care of you."  *Id.*  On March 23, 2011, Mr. Koplin received a complaint from Delphi employee Roman Chavira describing Plaintiff as "rude and demanding."  *Id.* at 7. In the complaining email, Mr. Chavira described several conversations he had with Plaintiff in which she warned him that she would speak to Mr. Heacox and make sure that Mr. Chavira no longer works for Delphi.  *Id.*

Mr. Koplin also received a letter from Delphi Warehouse General Supervisor David Mercer, signed and dated May 23, 2011, in which Mr. Mercer complained about a "verbal beating" that he received from Plaintiff in two phone conversations, and he observed that Plaintiff threatened to go to upper management "whenever she encounters an answer she doesn't like."  *Id.* at 8.

During the course of Delphi's investigation, Delphi's Audit Manager for Mexico and Latin America, Greg Ward, sent an email to Delphi's Laredo Plant

Manager questioning the justification for Plaintiff's position within Delphi. Heacox Dep. Ex. 5 at 4; Heacox Dep. Ex. 4. Mr. Ward also alerted Mr. Garcia to the ongoing investigation and requested information concerning Plaintiff. Garcia Decl., Ex. 4 (PEN00262).

### E. Delphi's Instruction to Remove Plaintiff from its Account

Following the investigation, on June 6, 2011, Mark Cashdollar, Delphi's Human Resources Director, called Mr. Heacox and informed him that Delphi's investigation did not uncover fraud or malfeasance on the part of Mr. Heacox, though they did find irregularities concerning personal expenses charged to the company credit card, for which he would forfeit a salary increase in the following year. Heacox. Dep. 55:5–15. As to Plaintiff, Mr. Cashdollar told Mr. Heacox that Delphi's "corner office" had decided to move Plaintiff off the Delphi account "because they did not like the way it looked and could lead to more questions." *Id.* 55:22–24; 57:3–13; Pl. Dep. 118:18–20 (noting that "the ramifications of the investigation" were "that I was going to be removed from that particular account"). Mr. Heacox understood "corner office" to refer to Delphi's President, James Spencer. Heacox Dep. 57:12–23. One week later, Mr. Cashdollar sent an email to Mr. Garcia stating Delphi "will no longer be requiring [Plaintiff's] services" and instructing Mr. Garcia to "coordinate an exit date for [Plaintiff]." Garcia Decl., Ex. 5 (PEN00315).

### F. Delphi's Rejection of Alternate Positions

After being instructed by Delphi to remove Plaintiff from its account, Mr. Garcia contacted Penske Area Human Resource Manager Krista Buescher to find

alternate positions for Plaintiff at Penske. Dkt. No. 43, Ex. E, Declaration of Krista Buescher ("Buescher Decl.") ¶¶ 5–6. Ms. Buescher and Mr. Garcia identified two available positions for Plaintiff: a customer service representative position and a billing clerk position. *Id.* ¶ 6; Garcia Decl. ¶ 22. Both positions were at the Mines Road facility and required interaction with Delphi. Garcia Decl. ¶ 24. Ms. Buescher and Mr. Garcia decided to offer the two available positions to Plaintiff and let her choose the one she preferred. Buescher Decl. ¶ 6; Garcia Decl. ¶ 22.

On June 17, 2011, Mr. Garcia sent an email to Mr. Cashdollar listing the open positions in Penske's Mines Road facility and explaining that Penske intended to offer these positions to Plaintiff. Garcia Decl. Ex. 6 (PEN00318). Mr. Cashdollar responded on June 21, 2011 and wrote that "[m]aybe it is best just to let you know her services are no longer required as of July 1." Garcia Decl., Ex. 7 at 2 (PEN00328). Ms. Buescher then wrote to Mr. Cashdollar stating that Penske would "move forward with offering [Plaintiff] the two positions that we have available at the Delphi location in Laredo, TX." *Id.* at 1 (PEN00327). Minutes later, Mr. Cashdollar wrote that "neither of the two positions in Laredo works for us – you are free to use her with one of your other clients." *Id.* Mr. Cashdollar then sent a letter to Ms Buescher, dated June 28, 2011, "confirm[ing] Delphi's request that Yvette Garcia no longer be assigned to work on the Delphi account, effective immediately." Buescher Decl. Ex. 3.

Mr. Garcia contacted his supervisor to determine if there were openings at Penske's two other Laredo locations; he learned there were not. Garcia Decl. ¶ 27.

### G. Plaintiff's Termination

On July 1, 2011, Mr. Garcia met with Plaintiff and presented her with a letter informing her she was being discharged and also presented her with the letter from Mr. Cashdollar instructing Penske to remove her from its account. Pl. Dep. 166:2–11; Garcia Decl. ¶ 28. Mr. Garcia then presented Plaintiff with a separation agreement that provided for eight weeks of severance pay. Garcia Decl. ¶ 29; *id.* Ex. 9. Plaintiff did not accept the agreement. Dkt. No. 43, Ex. D, Declaration of Tracy Schrey ¶ 8.

After filing a Charge of Discrimination against Penske and Delphi with the EEOC, Plaintiff initiated the instant action. Pl. Dep. Ex. 62.

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The initial burden is on the movant to point to portions of the record which he believes demonstrate the absence of a genuine dispute about a material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the movant would not bear the burden of proof at trial on a particular claim, he meets his initial burden on summary judgment if he identifies an element of the claim for which the non-movant has produced no evidence. *See Skotak v.*

*Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992). Once the movant has met his initial burden, the burden then shifts to the non-movant to come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the court draws all reasonable inferences in favor of the non-movant, the non-movant "cannot defeat summary judgment with conclusory, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation omitted). Conjecture and speculation also do not satisfy the non-movant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1079 (5th Cir. 1994).

## III.  ANALYSIS

Plaintiff has alleged claims under Title VII, ADEA, ADA, and the FMLA. Penske first argues that Plaintiff's Title VII, ADEA, and ADA claims are untimely and should not be equitably tolled. As to the remaining FMLA retaliation claim, Penske argues that summary judgment is appropriate because there is no direct evidence of FMLA retaliation, and Plaintiff cannot prove FMLA retaliation through indirect evidence.

### A.  Title VII, ADEA, and ADA Claims

#### i.  *Plaintiff's Title VII, ADEA, and ADA Claims are Untimely*

A plaintiff alleging employment discrimination claims must exhaust administrative remedies before pursuing her claims in federal court. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory

notice of right to sue." *Id.* (citing *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788–89 (5th Cir. 1996)). After receiving a right-to-sue letter, a claimant alleging violations of Title VII, the ADEA, or the ADA has ninety days to file a civil suit. *See* 42 U.S.C. § 2000e–5(f)(1) (Title VII claims); 29 U.S.C. § 626(e) (ADEA claims); *Dao v. Auchan Hypermarket,* 96 F.3d 787, 788–89 (5th Cir. 1996) (noting that "the ADA incorporates by reference the procedures applicable to actions under Title VII" (citing 42 U.S.C. § 12117(a))). "The ninety-day filing requirement is not a jurisdictional prerequisite, but more akin to a statute of limitations." *Harris v. Boyd Tunica, Inc.*, 628 F.3d 237, 239 (5th Cir. 2010) (citing *Espinoza v. Mo. Pac. R.R. Co.*, 754 F.2d 1247, 1248 n.1 (5th Cir. 1985)).

The requirement to file a lawsuit within the ninety-day period is, however, "strictly construed." *Stokes v. Dolgencorp, Inc.*, 367 F. App'x 545, 547 (5th Cir. 2010); *see also Taylor*, 296 F.3d at 379 (noting that "Courts within this Circuit have repeatedly dismissed cases in which the plaintiff did not file a complaint until after the ninety-day limitation period had expired"). "[C]ommencement of the ninety-day period begins to run on the day that notice is received at the address supplied to the EEOC by the claimant." *Bowers v. Potter*, 113 F. App'x. 610, 612 (5th Cir. 2004).

Here, the right-to-sue letter states that it was mailed on January 23, 2013, (Dkt. No. 43, Deposition of Orlando Lopez ("Lopez Dep.") Ex. 1), and an EEOC case log reflects that it was mailed on January 24, 2013 (Dkt. No. 43, Ex. J. (PEN00409)). The right-to-sue letter warns that the EEOC is closing its file on Plaintiff's discrimination charge and that any lawsuit must be filed within ninety

days of the notice "or [Plaintiff's] right to sue based on this charge will be lost." Lopez. Dep. Ex. 1. The letter is addressed to Plaintiff "c/o Orlando Lopez," who is Plaintiff's brother and the individual she appointed to represent her before the EEOC. *Id.*[4]

Mr. Lopez testified that he could not recall the date he received the letter. Lopez Dep. 38:23–39:5. Similarly, Plaintiff repeatedly testified that she too could not recall the date that she received the right-to-sue letter, though she did recall that her brother called her and informed her that the claims were dismissed. Pl. Dep. 196:20–23; 198:15–18.

When, as here, the date of receipt of the letter is unknown, courts presume the letter was received within three to seven days after it was mailed. *Taylor,* 296 F.3d at 379–80; *see also Stokes v. Dolgencorp, Inc.*, 367 F. App'x 545, 547–48 (5th Cir. 2010) ("When the plaintiff does not assert that she received her notice on a specific date, we may presume that she received it between three and seven days after it was mailed."). Applying the most generous presumption of seven days after mailing on January 24, 2013, Plaintiff received the letter on January 31, 2013. She was required to file her complaint ninety days later, *i.e.*, May 1, 2013. Because Plaintiff's complaint was not filed until May 29, 2013, her complaint is therefore untimely.

Plaintiff contends that the typical five-day presumption should not apply because there is a genuine issue of material fact concerning when she received the

---

[4] Mr. Lopez testified that he was previously a federal investigator with the EEOC from January 2009 until August 2011, at which time he became an equal opportunity specialist with the United States Department of Housing and Urban Development. Lopez. Dep. 10:1–20.

notice.  Dkt. No. 46 at 18–19.[5]  The Fifth Circuit has observed "that the presumption is only that:  a presumption.  If a particular plaintiff can offer some evidence to demonstrate that he or she did not receive the letter within the allotted time, the presumption can certainly be overcome."  *Morgan v. Potter*, 489 F.3d 195, 197 n.1 (5th Cir. 2007).[6]  In particular, Plaintiff points to her deposition testimony in which she suggests that she received materials "much later" later than the January 23, 2013 date reflected on the right-to-sue letter, and she argues that this testimony refers to the date she received the right-to-sue letters.  *Id.* at 19 (quoting Pl. Dep. 197:5).

However, as the following colloquy reflects, Plaintiff's reference to documents arriving "much later" relates to correspondence requested from the EEOC while the investigation was still ongoing, not to a right-to-sue letter issued after the EEOC's investigation had concluded:

> Q.  But you recall your brother calling you and telling you, Hey, Yvette, I received these dismissals?
>
> A.  And, actually, he didn't call me.  Somebody from the EEOC had called.  He was out of town because he travels a lot.  So, he I think didn't receive them either until much later, too.  So, I never received mine.
>
> [. . .]

---

[5] Although Plaintiff references a five-day presumption, the Court has applied the more generous seven-day presumption and finds the filing to be nonetheless untimely.  Indeed, "[i]n the Fifth Circuit, there is a presumption that a party receives the right-to-sue notice three days after it is mailed."  *Crabtree v. Cyberonics, Inc.*, No. 05-CV-4221, 2006 WL 1581971, at *2 (S.D. Tex. June 7, 2006) (quoting *Aportela v. Barnhart,* No. 03-CV-0360-DB, 2005 WL 1958963, at *11 (W.D. Tex. Aug. 15, 2005)).

[6] As one court has recognized, however, "[n]either the Fifth Circuit nor district courts within the circuit have elaborated upon the amount or type of evidence required to rebut the presumption of receipt."  *Keel v. Wal-Mart Stores, Inc.*, No. 1:11-CV-248, 2012 WL 3263575, at *5 (E.D. Tex. July 17, 2012) *adopted by*, No. 1:11-CV-248, 2012 WL 3262882 (E.D. Tex. Aug. 9, 2012).

Q.     . . . And so this gentleman called you on the phone to advise you -- what did he tell you, the EEOC guy, when he called you?[7]

A.     That they were -- they were going to send me a package . . . .

Q.     Was this when the investigation was still ongoing or was this --

A.     Yes, when the investigation was still ongoing.

Q.     Okay. What this is is this is the end of the investigation. This is the dismissal.

A.     Oh, I wasn't aware of the dismissal until after it was already dismissed.

Q.     And who -- how did you become aware that your EEOC charges, one against Penske, one against Delphi, had been dismissed?

A.     My brother called me.

*Id.* 196:24–25; 197:1–6; 198:1–15.

Plaintiff's argument rests upon a misreading of her own testimony quoted above, which makes clear that she was "not familiar with dates or times." *Id.* 198:23–24; *see also* 199:17–22 ("Q. And this letter is dated January 23rd, 2013. I assume it was sometime in January that you received notice from your brother that the EEOC had done something? A. I don't -- I don't recall right now. I don't know the time, to be honest.").

Plaintiff testified that she first became aware that her EEOC charges were dismissed when Mr. Lopez called her on a date she could not remember. *Id.* 198:15–

---

[7] Even if this statement does refer to receipt of the right-to-sue letter, the Court could find that the call from the EEOC concerning the dismissal is sufficient notice. *See Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 741–42 (S.D. Tex. 2003) (noting that "when the plaintiff receives actual notice by other means, such as being told by an EEOC representative that a right-to-sue letter has been issued, the ninety-day limitations period commences without regard to whether the letter is actually received at that time").

24. Mr. Lopez also testified that he called her to let her know that he received the dismissal and right-to-sue letter and told her "she has a window in which to file; and if she doesn't file within that window, she'll, you know, lose her right to file." Lopez. Dep. 37:1–10.  On that call, Mr. Lopez informed her that he had received the dismissal letter and instructed her to call the EEOC to determine why the EEOC decided to dismiss her claims.  Pl. Dep. 199:1–4.  Plaintiff then contacted the EEOC on an unknown date and requested a packet of information pursuant to the Freedom of Information Act.  *Id.* 199:5–7.  The EEOC then sent her the packet of information.  *Id.* 199:5–7.[8]

Plaintiff's reliance on *Smith v. Local Union 28 Sheet Metal Workers*, 877 F. Supp. 165 (S.D.N.Y. 1995) is misplaced.  In that case, unlike here, the plaintiff testified that he received the right-to-sue letters on one of two specific dates.  *Id.* at 172.  The court applied the later date, and finding that plaintiff's Title VII claims were still untimely even under the date proposed by plaintiff, dismissed the Title VII claims.  *Id.*  In contrast, Plaintiff does not – and indeed, repeatedly indicates that she cannot – approximate when she received the notice of right to sue, nor does she indicate that she received the letter "much later" than the seven-day presumption afforded to her by the Court.  The Court finds it appropriate, therefore, to apply the presumption of receipt, which makes Plaintiff's suit under Title VII, the ADEA, and ADA untimely.

---

[8] Indeed, the "much later" reference, even if it could be read to concern the time that she received the letter, only reaffirms that the date of receipt is unknown, which is the precise scenario envisioned by the Fifth Circuit's presumption of receipt.  *Taylor*, 296 at 379 (presuming receipt because plaintiff "failed to allege the specific date for which he actually received the right-to-sue letter and the date the letter was received is unknown").

### ii. *Equitable Tolling Does Not Apply*

Furthermore, Plaintiff does not argue that equitable tolling is warranted, nor does she demonstrate that it should be applied here. Because the Fifth Circuit treats the ninety-day period akin to a statute of limitations, "the ninety-day filing requirement is subject to equitable tolling." *Harris*, 628 F.3d at 239. The Fifth Circuit has cautioned that "[e]quitable tolling is to be applied sparingly," *Granger v. Aaron's Inc.*, 636 F.3d 708, 712 (5th Cir. 2011) (citation omitted), and even then, it "applies only in rare and exceptional circumstances," *Harris*, 628 F. App'x at 239 (citation omitted). Plaintiff has the burden to provide justification for equitable tolling. *Wilson v. Sec'y, Dep't of Veterans Affairs,* 65 F.3d 402, 404 (5th Cir. 1995). The Fifth Circuit has described three non-exhaustive circumstances to justify equitable tolling:

> (1) the pendency of a suit between the same parties in the wrong forum; (2) plaintiff's unawareness of the facts giving rise to the claim because of the defendant's intentional concealment of them; and (3) the EEOC's misleading the plaintiff about the nature of [his] rights.

*Granger*, 636 F.3d at 712; *see also Hood v. Sears Roebuck & Co.*, 168 F.3d 231, 234 (5th Cir. 1999)).

Plaintiff does not argue that any of the three situations apply. To the extent Plaintiff contends that equitable tolling is warranted because Mr. Lopez, who represented her during the processing of her case with the EEOC, moved at some point during the processing and caused her notice-of-claim to be delayed, *see* Dkt. No. 46 at 18–19, such argument is without merit.

The Fifth Circuit has noted that the ninety-day period commences when "notice is received at the address supplied to the EEOC by the claimant." *Bowers*, 113 F. App'x. at 612; *see also Ringgold v. Nat'l Maint. Corp.,* 796 F.2d 769, 770 (5th Cir. 1986) (holding that ninety-day period runs from date of delivery to offices of "designated counsel or to the claimant"). Plaintiff informed the EEOC that Mr. Lopez would be acting as her representative, and she provided Mr. Lopez's address to the EEOC. *See* Lopez Dep. 17:10–15 ("I told the EEOC I would be her representative/adviser through the process. [. . .] I can see why she put my name down."). That Mr. Lopez moved during the proceedings without notifying the EEOC does not mandate equitable tolling. *See Espinoza v. Missouri Pac. R. Co.*, 754 F.2d 1247, 1251 (5th Cir. 1985) ("Espinoza's position is that, simply because he was out of town when notice arrived at his home, the equities demand tolling. We heartily disagree."); *Crittendon v. Am. Nat'l Ins. Co.,* 967 F. Supp. 933, 942 (S.D. Tex. 1997) ("Failing to provide the EEOC with a current mailing address, thus jeopardizing the claimant's ability to receive the EEOC's notice of right-to-sue, represents one such circumstance that does not justify equitable tolling."); *Griffin v. Prince William Hosp. Corp.*, 716 F. Supp. 919, 921 (E.D. Va. 1989) ("[S]ensibly settled authority confirms that the EEOC is entitled to rely on the address plaintiff furnished and to start the running of the 90 day period by sending the right-to-sue letter to that address."). Moreover, the time-period is triggered when the notice is delivered, "not when the letter is actually picked up." *Hunter-Reed*, 244 F. Supp. 2d at 741 (noting that "requiring actual pickup would allow some plaintiffs open-ended time

extension, subject to manipulation at will") (citations omitted).

In addition, the Fifth Circuit is "reluctant to apply equitable tolling to situations of attorney error or neglect, because parties are bound by the acts of their lawyer." *Granger*, 636 F.3d at 712; *see also Irwin*, 498 U.S. at 96 (holding lawyer's absence from the office was "at best a garden variety claim of excusable neglect," and thus did not warrant equitable tolling). Although the Court recognizes that Mr. Lopez is not a lawyer, Plaintiff has not articulated any reason why a similar standard for garden variety neglect should not apply to someone whom she designated to represent her in an EEOC proceeding and someone who is familiar with the EEOC's guidelines and procedures based on his work as an EEOC investigator and equal opportunity specialist with HUD. *See* Lopez. Dep. 10; *see also* Lopez. Dep. 23:14 (stating in reference to EEOC proceedings that, "I know how the process works"); 26:22–24 ("But being a former investigator, I was hoping just to, you know, give him some insight of why I thought this would be a good case and try to explain to him").

Nor has Plaintiff shown that she pursued her rights diligently. The Fifth Circuit is "more forgiving" when a claimant and/or his attorney have "exercised due diligence in pursuing" the claimant's rights, and the Fifth Circuit "consider[s] it relevant whether the plaintiff took some step recognized as important by the statute before the end of the limitations period." *Granger*, 636 F.3d at 712. Here, Mr. Lopez forwarded Plaintiff an email on August 30, 2012, in which the EEOC warned that a notice of right-to-sue would be forthcoming and that Plaintiff will

then have "90 days to pursue in court if she chooses." Pl. Dep. Ex. 68. No evidence indicates that Plaintiff called the EEOC or Mr. Lopez to inquire about the right-to-sue letter between the time that she received the August 30 email and the unknown date that she learned that the EEOC dismissed her claims. Also, Plaintiff was again warned about the time limit when Mr. Lopez called to inform her that he received the right-to-sue letter and told Plaintiff, "You have a time limit with this" and urged her to act "quickly." Lopez. Dep. 37:23; *see also id.* 41:18–19 ("So when she got the notice of right to sue, I was like, You need to jump on it."). "One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984). Plaintiff has thus not met her burden to demonstrate that equitable tolling applies, and her Title VII, ADEA, and ADA claims are hereby **DISMISSED** as time-barred.

### B. FMLA Retaliation Claim

Penske next argues that summary judgment is appropriate for Plaintiff's retaliation claim under the FMLA because Plaintiff was dismissed for lawful reasons after she took leave pursuant to the FMLA, and because Penske did not discriminate or retaliate against her for requesting or taking such leave. Dkt. No. 43 at 12.

The FMLA prohibits employer interference with the exercise of rights provided under the act, or employer discrimination against any individuals for opposing a practice made unlawful under the act. *See* 29 U.S.C. § 2615. This prohibition extends to employer retaliation for the exercise of FMLA rights. *See* 29

C.F.R. § 825.220(c). Among the rights provided by the FMLA, employees are entitled to "reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(2); *see id.* § 2612(a)(1).

Plaintiff asserts that Penske's actions were motivated by retaliatory animus for her taking medical leave under the FMLA. The Fifth Circuit has instructed that the approach to such claims is twofold. *Ray v. United Parcel Serv.*, No. 13-60771, – F. App'x –, 2014 WL 6480423, at *3 (5th Cir. Nov. 20, 2014). First, a court asks whether the plaintiff has presented direct evidence of relation and, if not, then it applies the *McDonnell-Douglas* burden-shifting framework. *Id.* (citing *Richardson v. Monitronics, Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005)).

### i. There is No Direct Evidence of Retaliation

In order to "constitute direct evidence at this stage of the analysis," the evidence "must be such that, if believed, would prove the existence of a fact (i.e., unlawful discrimination) without any inferences or presumptions." *Ray*, 2014 WL 6480423, at *3 (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993)). Plaintiff acknowledges that no one at Penske told her that she was terminated because she took FMLA leave. Pl. Dep. 174:15–19. Instead, she argues that the comments made by her supervisor, Javier Garcia, constitute direct evidence of retaliation under the FMLA. Plaintiff stated in her deposition that Mr. Garcia told her more than once that she was "always sick," Pl. Dep. 36:2–10, and that he also told Delphi personnel that Plaintiff was "sickly and unreliable." *Id.* 26:12–17; 27:5–7.

19

Comments constitute direct evidence only if the comments meet four requirements: (1) they are related to the protected class of persons of which the plaintiff is a member; (2) they are proximate in time to the complained-of adverse employment decision; (3) they are made by an individual with authority over the employment decision at issue; and (4) they relate to the employment decision at issue. *Ray*, 2014 WL 6480423, at *11 (citing *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000)). Comments failing to satisfy these requirements are merely "stray remarks" that are independently insufficient to prevent summary judgment. *Id.* (citing *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010)).

Mr. Garcia's remarks to Plaintiff do not constitute direct evidence of discrimination because Plaintiff has not directed the Court to when Mr. Garcia made the remarks. *See Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010) (finding statement was not direct evidence where plaintiff "provided no evidence that the comment was proximate in time to his firing"); *Admire v. Strain*, 566 F. Supp. 2d 492, 500 (E.D. La. 2008) (finding comment did not amount to direct evidence of discrimination where "Plaintiff has not offered any evidence addressing when [plaintiff] made the statement"). The Court also notes that "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson*, 602 F.3d at 379–80.

Likewise, the statements that Plaintiff argues Mr. Garcia made to others are not proximate in time. At her deposition, Plaintiff stated that Mr. Heacox recounted to her a conversation he had with Mr. Garcia in which Mr. Garcia stated that Plaintiff "had an absence and a sickly condition." Pl. Dep. 40:20–41:2. Mr. Heacox testified that this conversation with Mr. Garcia took place in August 2008, more than three years before Plaintiff's termination in July 2011. Heacox Dep. 80:18–81:2; *see also* Pl. Dep. 49:8–16 (stating that Mr. Heacox "was given information that I was a sickly person prior to coming on board the [Delphi] division by Javier Garcia"). Plaintiff also points to comments that Mr. Garcia made to Delphi employee Carmen Dominguez prior to a promotion that Plaintiff received in February 2007, which was nearly four-and-a-half years before Plaintiff's termination. Pl. Dep. 71:3–20.[9]

Such comments, made years before her discharge, are not proximate in time to her complained-of adverse employment decision. *See Jackson*, 602 F.3d at 377 (finding comment nearly one year prior to termination was not proximate in time); *Berquist v. Wash. Mut. Bank,* 500 F.3d 344, 352 (5th Cir. 2007) (determining comment six months prior to termination was not probative of discriminatory intent because it was "remote in time from [plaintiff's] firing"). Accordingly, the comments are not direct evidence of retaliation because they are not proximate in time to

---

[9] Plaintiff also stated at her deposition that Mr. Garcia made similar remarks to Delphi employees Ajay Bhargava and John Kalusniak, although she could not recall when those statements were made. Pl. Dep. 43:4–14. The Court further notes that Plaintiff makes no attempt to rebut Penske's argument that statements by Mr. Garcia to several Delphi employees, who then reported the statements to Plaintiff, constitute inadmissible hearsay. Dkt. No. 43 at 17–18.

Plaintiff's termination in July 2011, and the Court need not consider whether the stray remarks satisfy the other elements of direct evidence.

### ii. *McDonnell-Douglas Analysis*

As Plaintiff has presented no direct evidence of discrimination, the following burden-shifting analysis applies. First, Plaintiff must make a prima facie showing of FMLA retaliation. *Richardson*, 434 F.3d at 333. Second, if she satisfies the first requirement, Penske "must articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* Third, if Penske makes a sufficient showing, Plaintiff "must offer sufficient evidence to create a genuine issue of fact" that Penske's proffered reason is merely a pretext for retaliation or, "although true, is but one of the reasons for its conduct, another of which was discrimination." *Id.* Finally, if Plaintiff satisfies the third-step showing, Penske may only prevail by proving it would have taken the adverse employment action regardless of the discriminatory motivation; this showing "is effectively that of proving an affirmative defense." *Id.* (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005)).

### a. Plaintiff Has Made a Prima Facie Showing

In order for Plaintiff to meet her initial burden of establishing an FMLA prima facie case, she must show the following elements: (1) she was protected under the FMLA; (2) she suffered an adverse employment action; and (3) the adverse action was taken because she sought protection under the FMLA. *Ray*, 2014 WL 6480423, at *4 (citing *Ion v. Chevron*, 731 F.3d 379, 390 (5th Cir. 2013)). The first two elements are undisputed, since both parties acknowledge that Plaintiff

took leave under the FMLA during her employment with Penske and that she suffered an adverse employment action when she was discharged in 2011. Dkt. Nos. 43 at 7, 46 at 16. At issue is the third element, namely whether Plaintiff has established the necessary causal link between her FMLA leave and her discharge.[10]

To establish the third prong of a prima facie case of retaliation under the FMLA, "the plaintiff does not have to show that the protected activity is the only cause of her termination." *Mauder*, 446 F.3d at 583. A plaintiff must, however, "show that the protected activity and the adverse employment action are not completely unrelated." *Id.* (citing *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)). This prong "is not an ultimate showing of liability, but merely determines whether there is enough evidence to require an employer to respond." *Ivy v. Lane Furniture Indus., Inc.*, No. 1:08-CV-20, 2009 WL 1663439, at *3 (N.D. Miss. June 15, 2009); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) (observing that the burden is "not onerous" and only creates a "presumption"). All that is required is "a causal connection between the protected activity and the discharge." *Chaffin v. John H. Carter Co.,* 179 F.3d 316, 319 (5th Cir. 1999).

---

[10] Although Penske initially argues that the third element is not met because Plaintiff has failed to identify a similarly situated comparator who was treated more favorably, Dkt. No. 43 at 7, this argument is foreclosed by Fifth Circuit precedent stating that the third element is satisfied in the alternative by showing "*either* (a) she was treated less favorably than an employee who had not taken FMLA leave, *or* (b) the adverse decision was made because she took FMLA leave." *Mowbray v. Am. Gen. Life Cos.*, 162 F. App'x. 369, 374 (5th Cir. 2006) (emphasis supplied); *see also Shryer v. Univ. of Tex. Sw. Med. Ctr. at Dallas*, No. 14-10079, – F. App'x –, 2014 WL 5315358, at *4 (5th Cir. Oct. 16, 2014) ("To make out a prima facie case of retaliation, she must . . . establish that she was terminated because she took FMLA leave *or* that she was treated less favorably than an employee who had not requested leave") (emphasis supplied).

As instructed by the Fifth Circuit, the Court first considers the temporal proximity between the FMLA leave and the discharge. *See Mauder*, 446 F.3d at 583 ("When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the 'temporal proximity' between the FMLA leave, and the termination."). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997) (citation omitted); *see also Evans*, 246 F.3d at 354 (noting that a time lapse of four months has been held sufficient to establish a plaintiff's *prima facie* case).

Here, Plaintiff took leave under the FMLA numerous times while employed at Penske, most recently on June 24, 2011. Dkt. No. 43 at 18. She was discharged seventeen days later on July 11, 2011. Garcia Decl. ¶ 28. Courts have found similar periods of time sufficient to satisfy the causation standard. *See Miles-Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 870 (S.D. Tex. 2008) (finding causal connection where plaintiff presented evidence that alleged termination occurred fifteen days after request for accommodation).

In addition, Plaintiff contends that Mr. Garcia "entertained complaints about Plaintiff's absences from work" that were related to her illnesses and her use of FMLA leave. Dkt. No. 46 at 17. Mr. Garcia confirmed this in his Declaration, stating that "[w]hen Ms. Garcia took medical leave, her co-workers frequently would complain to me about her calling out sick at the last minute and her lack of

accessibility during absences, and the fact that they had to fill in for her . . . ." Garcia Decl. ¶ 9. At the very least, this demonstrates that Plaintiff's supervisor was aware of Plaintiff's protected activity of taking FMLA leave. *See Smith v. Potter*, No. 10-CV-121, 2012 WL 2785893, at *6 (W.D. La. July 3, 2012) ("The Fifth Circuit has also noted that an 'employer's awareness of an employee's protected activity might be sufficient to establish the causal link element.'") (quoting *Shannon v. Henderson*, 275 F.3d 42, 2001 WL 1223633, at *4 (5th Cir. Sept. 25, 2001)).

Accordingly, given the relatively close proximity between her discharge and her protected activity, as well as her supervisor's knowledge of the protected activity, the Court finds evidence that minimally establishes the "not onerous" causation element of Plaintiff's *prima facie* case of FMLA retaliation.

### b. Penske Offers Legitimate Non-Retaliatory Reasons

Because Plaintiff satisfies the first requirement, Penske "must articulate a legitimate, non-discriminatory reason for the adverse employment action." *Richardson*, 434 F.3d at 333. In this case, Plaintiff's position was created to service Penske's customer, Delphi. Pl. Dep. 72:4–73:21; Garcia Decl. ¶ 10. In the spring of 2010, Plaintiff began a romantic relationship with Mark Heacox, Delphi's Director of Manufacturing for the Americas. Pl. Dep. 41:23–42:2; Heacox Dep. 23:19–21. On March 2, 2011, Delphi's Global Investigations Manager Jarriel Kopling received a complaint from a Delphi employee that Plaintiff was using her relationship with Mr. Heacox to threaten and intimidate Delphi employees. Koplin Decl. 5–6. As

Plaintiff herself testified, "the ramifications of the investigation" were "that I was going to be removed from that particular account."  Pl. Dep. 118:18–20.

On June 13, 2011, Mark Cashdollar, Delphi's Director of Americas Human Resources, wrote to Mr. Garcia and stated that Delphi "will no longer be requiring [Plaintiff's] services" and asked Mr. Garcia to "[p]lease coordinate an exit date for" her.  Dkt. No. 43, Garcia Decl., Ex. 6 (PEN00319).  Mr. Garcia then worked with Penske's human resources team to identify open positions at Penske for Plaintiff.  Garcia Decl. ¶ 22.  They found two open positions and decided to offer Plaintiff the positions.  *Id.*  When Delphi was informed of Penske's intent to offer the two positions to Plaintiff, Delphi explained that neither of the two positions were acceptable because they required interaction with Delphi.  Garcia Decl. ¶¶ 24–27; *id.*, Ex. 7 (containing email chain from Delphi stating that "[m]aybe it is best just to let you know [Plaintiff's] services are no longer required as of July 1" and that "neither of the two positions in Laredo works for us").  On June 28, 2011, Delphi sent Penske a letter confirming "Delphi's request that Yvette Garcia no longer be assigned to work on the Delphi account, effective immediately."  Garcia Decl., Ex. 8 (PEN00335)).

Neither party disputes that Delphi's instruction to Penske that Plaintiff be removed from Delphi's account constitutes a legitimate, non-retaliatory reason for her termination.  *See Jumbo v. Rodrigues*, No. 4:12-CV-2906, 2013 WL 5703628, at *7 n.5 (S.D. Tex. Oct. 18, 2013) (finding customer complaints to be a legitimate, non-

retaliatory reason for termination). Thus, Penske has met its burden of providing a legitimate, non-discriminatory reason for discharging Plaintiff.

### c. Plaintiff Has Not Established Pretext

Proceeding, then, to the third stage of the analysis, the burden again shifts to Plaintiff to present evidence creating a fact issue that Penske's proffered reason is either a mere pretext for retaliation and "false or unworthy of credence," or although true, is but one of the motivations for the adverse action, another of which was retaliation. *Ray*, 2014 WL 6480423, at *6 (citing *Autry v. Fort Bend Indep. Sch. Dist.,* 704 F.3d 344, 347–48 (5th Cir. 2013)). Plaintiff's arguments center on exposing Penske's reason as pretext. *See* Dkt. No. 46 at 17–18. This inquiry "focuses on whether [Penske']s explanation was the true basis of its action, the real reason, rather than on the accuracy of the explanation." *Id.* (quoting *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011)). Accordingly, in the summary-judgment context, Plaintiff's burden requires production of evidence that raises a genuine issue of material fact that retaliation, not Delphi's instruction that she be removed from its account, was the real reason for her termination.

To meet this burden, Plaintiff argues that she has established pretext by pointing solely to comments made by Mr. Garcia:

> Garcia's comments about Plaintiff and her "serious" medical condition, and Garcia's comments to Delphi officials concerning Plaintiff and her "serious" medical condition and her unreliability based on her absences are all indications of an animus towards Plaintiff and her serious medical condition, and by extension her use of FMLA and her absences. Therefore, the Court may infer discriminatory intent and that the reasons given are pretext for discriminatory conduct.

Dkt. No. 46 at 17–18.

The Fifth Circuit, however, has repeatedly stated that remarks alone cannot provide sufficient evidence of pretext to meet a plaintiff's burden under the third step. *See Cervantez v. KMGP Servs. Co. Inc.*, 349 F. App'x 4, 11 (5th Cir. 2009) (granting summary judgment and noting that "a comment is not evidence of discrimination if it is the sole proof of pretext, or if it is not made in temporal proximity to the adverse employment decision"); *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003) (noting that remarks can be probative of discriminatory intent, provided they "are not the only evidence of pretext"); *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 403 n.7 (5th Cir. 2001) (refusing to consider stray remarks as circumstantial evidence of age discrimination where there was no other evidence of pretext). Since Plaintiff's pretext argument rests solely on the comments made by Mr. Garcia – which as the Court has addressed above, do not rise to direct evidence of discrimination – the Court concludes that Plaintiff has failed to meet her burden at summary judgment on this claim.

Even if the Court considers at the pretext stage the evidence Plaintiff put forth to establish her *prima facie* case, her claim still fails.[11] First, as to the temporal proximity between Plaintiff's most recent FMLA leave and the decision to terminate her, the Court is unpersuaded that it is sufficient to establish pretext,

---

[11] The Supreme Court has recognized that "although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production," the Court "may still consider the evidence establishing the plaintiff's prima facie case . . . on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143.

particularly in light of Penske's history of approving Plaintiff's FMLA leave. From 2005 to 2011, Plaintiff requested FMLA leave twenty-five times. Dkt. No. 43 at 17–18. Penske approved each request, and by Plaintiff's own admission, never disciplined her for taking leave, but instead reinstated her each time. Pl. Dep. 89:8–17. Courts have reasoned that prior approval of numerous FMLA requests counters against attempts to establish pretext through proximity in time. *See Yashenko v. Harrah's NC Casino Co., LLC*, 352 F. Supp. 2d 653, 662 (W.D.N.C. 2005) (finding it was appropriate to consider employer's history of granting FMLA leave in evaluating whether employee has satisfied his burden of proving pretext, and "fact that the Defendant had historically and regularly granted Plaintiff medical leave followed by the full restoration of his employment is evidence that Defendant acted without discriminatory intent" in discharging employee); *see also Distefano v. Essentia Health*, No. 12-CV-2868, 2014 WL 3101324, at *8 (D. Minn. July 8, 2014) (refusing to find pretext where employee was fired on the very day that she exhausted her FMLA leave, reasoning that because plaintiff had taken FMLA leave on eleven different occasions "without a hint of retaliation from" her employer, "[i]t simply beggars belief" that she would be fired for exhausting her remaining medical leave); *Pruitt v. Peninsula Reg'l Med. Ctr.*, No. 14-CV-344, 2014 WL 2916863, at *5 (D. Md. June 25, 2014) (finding employer's "approval of [plaintiff]'s prior FMLA requests further strengthens its argument that [plaintiff] was discharged for a legitimate reason").

Next, Plaintiff argued in her *prima facie* case that Mr. Garcia entertained complaints about Plaintiff's absences that were related to her FMLA leaves. It is undisputed that Mr. Garcia received such complaints concerning Plaintiff from others. *See* Garcia Decl. ¶ 9. It is equally undisputed, however, that "[w]henever Ms. Garcia's co-workers complained to [Mr. Garcia] about her medical leaves, [he] told them that it was the law and that she was entitled to take those leaves of absence under the FMLA." *Id.* Even assuming statements by other unnamed persons to Mr. Garcia could overcome an obvious hearsay obstacle under Federal Rule of Evidence 802, the Court finds that such evidence does not support a finding that Penske's non-discriminatory motive for discharging Plaintiff was a pretext.

Lastly, Plaintiff contended in her *prima facie* case that Mr. Garcia directed her to work from the office rather than home, which she asserts implies some discriminatory animus. Dkt. No. 46 at 17. As an initial matter, "[t]he FMLA only provides an entitlement to take leave, not to work from home." *Bennett v. Girl Scouts of Ne. Texas*, No. 4:09-CV-443, 2010 WL 723794, at *3 (E.D. Tex. Feb. 25, 2010) (citing 29 U.S.C. § 2612). Furthermore, the Fifth Circuit has repeatedly recognized an employer's need to have its employee in the office. *See Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 400 (5th Cir. 2012) (noting "the necessity of in-office time for purposes of customer service and team work"); *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 859 (5th Cir. 2010) ("Regular attendance is a necessary qualification for most jobs."); *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th

Cir. 1998) ("Team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance.").

Penske has put forward significant evidence demonstrating that Plaintiff was instructed to work from the office due to concerns raised by Penske's customer, Delphi. As mentioned before, Delphi's internal investigations manager received a complaint from a Delphi employee on March 2, 2011, that Plaintiff was using her relationship with Mr. Heacox to threaten and intimidate Delphi employees, and that Mr. Heacox was using his company credit card to pay non-business expenses for Plaintiff. Koplin Decl., Ex A at 5. On March 24, 2011, Michael Sandoval, who was senior to Mr. Garcia at Penske, sent an email to Plaintiff questioning the scope of Plaintiff's work, in response to her travel request to Mexico. Pl. Dep., Ex. 46 at 2. Six days later, on March 30, 2011, Delphi's Audit Manager for Mexico, Greg Ward, expressed his concern about the need and cost of Plaintiff's position in an email to Delphi's Laredo Plant Manager. *See* Heacox Dep., Ex. 5 at 12 (Doc. 000457) (stating that "I wonder why do we need this position??" and "if this position is a 'sales' position . . . what type of sales activities are being performed between Delphi and Penske that would require this cost??"); *see also* Heacox Dep. 35:10–40:20. On April 8, 2011, Delphi's Corporate Security then sent Mr. Garcia a confidential request for information pertaining to Plaintiff's job role, her expense reports, and cell phone charges. Garcia Decl. Ex. 4 (PEN00262). The next month, Mr. Garcia sent Plaintiff an email stating that she should work from the office beginning on June 1, 2011. Pl. Dep., Ex. 50 at 1. Considering the scrutiny by Penske and Delphi of Plaintiff's

role and conduct immediately preceding this email, even Plaintiff herself admitted that she was not surprised that she was being asked to work in the office.  *See id.* 141:16–142:13.

In sum, Plaintiff has failed to show that Penske did not discharge her for the reasons it stated.  While Plaintiff may genuinely believe she was discriminated against, "'a subjective belief of discrimination, however genuine, [may not] be the basis of judicial relief.'"  *Lawrence v. Univ. of Texas Med. Branch*, 163 F.3d 309, 313 (5th Cir. 1999) (quoting *Elliott v. Group Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983)).  Accordingly, because Plaintiff has not shown the reasons Penske provided for her discharge were pretextual and were not the basis for its decision to discharge her, Penske is entitled to summary judgment on her FMLA claim.

## IV. CONCLUSION

For the reasons explained above, the Court concludes that Plaintiff's ADA, Title VII, and ADEA claims are time-barred, and her FMLA claim cannot withstand summary judgment because she has failed to rebut Penske's proffered reason for her discharge.  Accordingly, Defendant Penske's Motion for Summary Judgment (Dkt. No. 43) is hereby **GRANTED** and all claims by Plaintiff against Penske are **DISMISSED WITH PREJUDICE**.

It is so **ORDERED**.

**SIGNED** this 18th day of December, 2014.

Marina Garcia Marmolejo
United States District Judge

32